1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MYKENZI M.,

                Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

CASE NO. 24-5324 BAT

**ORDER REVERSING THE
COMMISSIONER'S DECISION**

Plaintiff appeals the ALJ's denial of their application for Supplemental Security Income ("SSI"). They contend the ALJ erred in assessing evidence regarding their autism in conjunction with the ALJ's evaluation of the medical opinion evidence, Plaintiff's testimony, and lay witness testimony, such that the ALJ's residual functional capacity ("RFC") assessment was incomplete. Dkt. 9 at 1. As discussed below, the Court **REVERSES** the Commissioner's final decision and **REMANDS** the matter for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

## BACKGROUND

Plaintiff is currently twenty-three years-old, has a high school education, and no past relevant work. Tr. 160-75, 42, 29. Plaintiff, who graduated from high school in 2020, had an individualized education plan ("IEP") and received special education services throughout eighth

ORDER REVERSING THE COMMISSIONER'S DECISION - 1

grade and high school based on social, emotional, and behavioral issues.[1]  Tr. 277, 307, 304, 316, 456.

On August 30, 2021, Plaintiff applied for benefits, alleging disability as of September 19, 2019.[2]  Tr. 160-75.  Their application was denied initially and on reconsideration.  Tr. 60-69, 70-78.  The ALJ conducted a hearing on July 24, 2023, and the ALJ subsequently found Plaintiff not disabled on September 26, 2023.  Tr. 37-52, 16-31.  As the Appeals Council denied Plaintiff's request for review, the ALJ's decision is the Commissioner's final decision.  Tr. 1-6.

**DISCUSSION**

Plaintiff argues the ALJ failed to properly consider the impact of their autism when evaluating the medical opinion evidence, Plaintiff's testimony, the lay witness testimony, and in assessing their RFC.  Dkt. 9 at 1-13.  The Court agrees.

At step two, the ALJ found Plaintiff suffered from several severe impairments, including autism, gender dysphoria, attention deficit hyperactivity disorder ("ADHD"), and depressive disorder.  Tr. 19.  The ALJ subsequently discounted Plaintiff's testimony, lay witness testimony from Plaintiff's mother, C.M., and medical opinion evidence from DSHS examining psychologist, Dr. Ruddell, in finding Plaintiff possessed an RFC for a "full range" of work with additional social and cognitive limitations.  Tr. 22-25, 28-29.  Specifically, the ALJ found Plaintiff was capable of work that:

> consists of simple instructions; that follows standardized procedures; that occurs in a consistent location; that does not require more than frequent interaction with coworkers or supervisors; that does not require more than occasional, superficial

---

[1] Although Plaintiff's IEP and special education dated back to at least 2015, the educational records included in the AR date back only to January 2019.  Tr. 265-318.

[2] Supplemental security income benefits are not retroactive to the date of disability onset, but are payable one month following the month in which the application was filed, which in this case, would have been September 2021.  *See* 20 C.F.R. § 416.335.

interaction (such as "good morning" or "here is the item") with the general public; and that provides goals for [Plaintiff].

Tr. 22-23.

Plaintiff argues the administrative record contained educational records and additional evidence regarding the impacts of Plaintiff's autism – namely their inability to interact appropriately with others and to function "outside of an accommodated workplace" – which Plaintiff claims the ALJ failed to properly consider. Dkt. 9 at 3-5.  In support, Plaintiff notes there is no "cure" for autism, and describes generally the characteristics or symptoms of autism and the available interventions.  Dkt. 9 at 2-4.

Plaintiff cites several specific examples of their behavioral issues and other social, emotional, and communicative difficulties from their IEP and school records and from the notes of their treating developmental pediatrician, including:

(1)      a January 2019 IEP evaluation, noting that Plaintiff had been in special education since eighth grade, which included teachers' observations regarding Plaintiff's verbal and physical aggression, difficulties with peer relationships, responding appropriately, staying on task, and completing assignments.  *See* Tr. 277-84 (teachers state that Plaintiff's "concerning" behaviors included anger outbursts, verbal assaults, extreme defiance, pulling hair out when they are upset, and name calling, and that "[i]ntervention strategies which [had been] previously effective were no longer effective" because Plaintiff now "stand[s] [their] ground and refuses to take responsibility regardless of [their] own actions and the impact it has on others in the classroom");

(2)      Pediatrician, Dr. Hood's November 2018 notes from a follow-up developmental behavioral pediatrics evaluation, stating that Plaintiff had an IEP

and was in special education based on their disruptive behavior and "lack of social awareness," including a threat to set a classmate on fire, and threats to kill everyone and themself, and recommending Plaintiff remain in special education with the services appropriate for a child with autism.  Tr. 456-64;

(3)     School psychologist, Dr. Poljak's assessment in 2019, that Plaintiff's adaptive behaviors, social and emotional development, and social skills were "well-below average," and "negatively impact[ed]" their "ability to successfully access the general education setting."  Tr. 278-97;

(4)     Dr. Hood's March 2019 progress notes noting that Plaintiff was refusing to take their medications regularly, that Plaintiff had recently been suspended from school following an altercation with a student in their class, and that school administrators were considering moving Plaintiff to a "self-contain[ed] program" within the school.  Tr. 449;

(5)     Dr. Hood's August 2019 progress notes, referencing Plaintiff's recent arrest for pouring peroxide on another student while on a school bus, which subsequently required Plaintiff to attend a diversion program and twelve weeks of family therapy. Tr. 439;

(6)     January 2020 IEP meeting notes, stating that since Plaintiff was placed in the smaller self-contained program at school, their self-regulation, social regulation, and verbally assaultive behaviors had improved, but that they continued to "break[] the rules, def[y] authority figures, disobey[]," and "sometimes" continued to "make[] hurtful comments to others and ha[d] a very negative view of students with disabilities."  Tr. 303-04.  Additionally, Plaintiff's teachers reported

in 2020 that Plaintiff was failing three out of four classes, their "autism adversely impacts [their] involvement with and progress in the general education curriculum," and they "require[d] specially designed instruction." Tr. 303-04. In addition to specially designed instruction, Plaintiff also received multiple accommodations, including additional time on work, extra time to respond, breaks during testing, use of ear plugs or headphones, advance examples of completed projects, extra time to process oral information, frequent checks for understanding, specialized directions, ability to leave the classroom to self-soothe, preferential seating, and extra time on tests. Tr. 310;

(7)     January 2020 therapy notes from Plaintiff's high school records that noted that Plaintiff was experiencing meltdowns, in which their mother reported that Plaintiff would cover their ears due to noise sensitivity, bite themself, break things, throw things, and hit their head; that law enforcement had been to Plaintiff's house "multiple times;" and that Plaintiff's school frequently contacted their mother because Plaintiff threatened to hurt themself or others. Tr. 262; and

(8)     Speech pathologist, Dr. Dodson's October 2020 notes, following referral for Plaintiff "to improve self-care and living skills, social skills, personal hygiene skills, and money management," during which Dr. Dodson found that Plaintiff's examination demonstrated deficits with "attention, short-term memory, and working memory," and "executive functioning." Tr. 417-18.

*See* Dkt. 9 at 6-8, 11.

Plaintiff argues the ALJ failed to properly consider the above evidence, along with more generally failing to consider the evidence pertaining to their autism – noting that sometimes the

ORDER REVERSING THE COMMISSIONER'S DECISION - 5

1    ALJ failed to address the evidence in its entirety, and, other times, the ALJ downplayed or

2    discounted the evidence for improper reasons.  Dkt. 9 at 9-11.  Specifically, Plaintiff asserts the

3    ALJ harmfully erred when he disregarded the "documented. . . difficulties that Plaintiff had

4    maintaining appropriate behavior" at school "even when [Plaintiff was] placed in a smaller

5    environment and with additional supervision and instruction," and at home "even after they

6    graduated from high school and were not facing the same expectations and pressures."  Dkt. 9 at

7    12.  Citing Social Security Ruling ("SSR") 11-2p, Plaintiff contends that consideration of the

8    difficulties related to their autism would have supported a finding Plaintiff was not able to work

9    in a competitive work environment.  Dkt. 9 at 5; *see also* SSR 11-2p, Titles II and XVI:

10   Documenting and Evaluating Disability in Young Adults, 2011 WL 4055665 (Sept. 12, 2011).

11          Plaintiff thus requests the Court remand for further development of the record and for a

12   fuller evaluation of the evidence showing the impact their autism-related limitations have on

13   their ability to sustain full-time, competitive employment.  Dkt. 9 at 13.

14          The Commissioner counters that the evidence Plaintiff relies on improperly predates the

15   August 30, 2021 commencement of the relevant period in this case.  Dkt. 11 at 2.  Specifically,

16   the Commissioner suggests the evidence from high school is not relevant.  Dkt. 11 at 2.  The

17   Commissioner acknowledges the ALJ discussed some evidence from Plaintiff's high school that

18   predated the relevant period – from January 10, 2019 onward – and contends that rather than

19   "reject[ing]" the evidence, "[t]he ALJ merely correctly noted that this evidence predated the

20   relevant period."  Dkt. 11 at 2-3; Tr. 265-318.  The Commissioner additionally suggests "while

21   [Plaintiff's cited] evidence shows that school was a 'big trigger' for Plaintiff, there is no

22   corollary evidence that work was a big trigger."  Dkt. 11 at 8.

23

1    Social Security Ruling 11-2p, which governs the evaluation of disability in young adults,

2    however, is to the contrary.  *See* 2011 WL 4055665.  It explicitly recognizes "evidence about a

3    young adult's function from school programs, including IEPs, . . may indicate how well [the

4    claimant] can use their physical or mental abilities to perform work activities."  *Id.* at *7-8.  The

5    ruling further explains that certain "school-reported difficulties," might portend difficulty with

6    work activities, including "[d]ifficulty communicating spontaneously and appropriately in the

7    classroom," and "[d]ifficulty relating to authority figures and responding appropriately to

8    correction or criticism during school or a work-study experience."  *Id.* at *7.

9    Here, while the ALJ acknowledged Plaintiff's "history of an [IEP] for social emotional

10   support in high school due to behavioral difficulties," the ALJ failed to adequately consider on

11   the merits the evidence related to Plaintiff's educational functioning and the limitations

12   associated with their autism, suggesting mistakenly that the records were not relevant because

13   they were from "outside the time-period at issue," and because Plaintiff was "high functioning."

14   Tr. 25 (citing Tr. 455).  This failure to adequately consider Plaintiff's IEP and special education-

15   related records in evaluating the testimony, opinion evidence, and in assessing their RFC was

16   contrary to the guidance set forth by SSR 11-2p.[3]  *See* 2011 WL 4055665.

17   A "young adult" is defined as "between the ages of 18 to approximately 25."  SSR 11-2p,

18   2011 WL 4055665, at *2.  Here, Plaintiff was nineteen years-old at the time they filed their SSI

19   application in August 2021, and was twenty-two years-old at the time the ALJ issued his

20   decision in September 2023.  Tr. 31.  Accordingly, Plaintiff was a young adult under SSR 11-2p

21   for the entire relevant period.

22

23

---

[3] SSR 11-2p is binding on ALJs.  *See Heckler v. Edwards*, 465 U.S. 870, 873 n. 3 (1984) (Social Security Rulings are binding on all SSA decisionmakers).

ORDER REVERSING THE COMMISSIONER'S DECISION - 7

1        Contrary to the Commissioner's argument otherwise, Plaintiff's IEP and special

2   education records – even those that predated Plaintiff's 2020 application date – were indeed

3   relevant as provided by SSR 11-2p because Plaintiff remained a young adult throughout the

4   entire relevant period at issue.  *See* SSR 11-2p, 2011 WL 4055665, at *5 (noting that "[e]vidence

5   from school programs, including secondary and post-secondary schools," constitutes one source

6   of relevant evidence regarding a young adult's ability to work); *see also id.* at n. 19 (noting that

7   "'special education' refers to instructional services provided to students through age 21 in

8   primary and secondary education under the Individuals with Disabilities Education Improvement

9   Act of 2004").

10       SSR 11-2p states, in evaluating a young adult's impairment-related limitations, the SSA

11  considers evidence regarding functioning from:  (1) educational programs; (2) community

12  experiences, including job placements; (3) psychosocial supports and highly structured or

13  supportive settings; (4) extra help and accommodations; and (5) work-related stress.[4]  2011 WL

14  4055665 at *6-10.  The ruling specifically names several categories of educational evidence that

15  will assist an ALJ in determining a young adult's functioning, including: (1) evidence concerning

16  whether the young adult received special education and related services; (2) evidence pertaining

17  to any individualized education program ("IEP") formulated for the young adult, describing the

18  skills they needed to develop; (3) evidence pertaining to IEP transition goals, whether

19  transitioning to supervised and supported work and living settings, or independent ones; and (4)

20  considerations related to the fact that goals contained in an IEP may be set at an achievable level

21

22

---

23  [4] Evidence that a claimant has difficulties in the above areas does "not necessarily establish that a young adult is disabled, only that the person may have limitations that affect what work [they] may be able to do."  *Id.* at *7.

ORDER REVERSING THE COMMISSIONER'S DECISION - 8

1    to foster a sense of accomplishment, and "may be lower than what would be expected of a young

2    adult without impairments."  2011 WL 4055665 at *5-6.

3            Here, based on the limited educational evidence included in the record from 2019 through

4    Plaintiff's 2020 graduation date, there is no dispute that Plaintiff attended special education

5    classes since at least eighth grade, that Plaintiff had an IEP, and that Plaintiff experienced

6    significant difficulties with social interactions and behavioral regulation, among other difficulties

7    – difficulties that were memorialized and attested to by school psychologists, school

8    administrators, teachers, Plaintiff's developmental pediatrician, Plaintiff's mother, and other

9    medical providers.  Tr. 277-84, 456-64, 287-97, 449, 439, 303-04, 310, 262, 417-18.  The

10   education-related evidence that the ALJ failed to adequately consider squarely fell within the

11   confines of SSR 11-2p, such that the ALJ should have considered it in evaluating the testimony

12   and medical opinion evidence.[5]

13           Moreover, as discussed below, the ALJ's error in failing to adequately consider the

14   autism-related evidence was not rendered harmless by the ALJ's additional findings.

15           In opposition, the Commissioner argues the ALJ properly rejected or discounted evidence

16   regarding the limitations associated with Plaintiff's autism, including Plaintiff's testimony and

17   Dr. Ruddell's opinion.[6]  Dkt. 11 at 4-8.  The Commissioner asserts Plaintiff's autism was

18

19   [5] Additionally, SSR 11-2p instructs ALJs to consider evidence from other sources who are not
     medical sources, "but who know and have contact with the young adult [and] can help [the ALJ]
20   evaluate the severity and impact of a young adult's impairment(s)."  2011 WL 4055665 at *5.
     The ruling provides examples of such non-medical sources, including "family members or
21   educational personnel (for example, teachers and counselors), public and private social welfare
     agency personnel, and others (for example, friends, neighbors, and clergy)."  *Id.*  Accordingly,
22   on remand, the ALJ should reconsider Plaintiff's mother's testimony in light of SSR 11-2p as
     well.

23   [6] The Commissioner does not address the lay testimony regarding the impacts of Plaintiff's
     autism.

ORDER REVERSING THE COMMISSIONER'S DECISION - 9

1    "interrelated" with their other impairments, and suggests Plaintiff has improperly attempted to

2    "silo their autism symptomology," pointing to lapses and/or absences in Plaintiff's mental health

3    treatment, which the Commissioner contends was an appropriate reason for the ALJ to discount

4    the evidence.  Dkt. 11 at 4-6; *see also* Tr. 25.  Additionally, the Commissioner points to other

5    reasons that supported the ALJ's findings regarding the challenged testimonial and opinion

6    evidence, including improvement in Plaintiff's behavior in school and "after graduation," Dkt.

7    11 at 8 (no corresponding citation to ALJ's decision); "frequently normal" examination findings,

8    Dkt. 11 at 6 (citing Tr. 26); Plaintiff's summer work at an amusement park, Dkt. 11 at 7-8 (citing

9    Tr. 24); and Plaintiff's desire to attend art college.  Dkt. 11 at 7 (citing Tr. 24, 26).

10           Both the ALJ and the Commissioner improperly conflate Plaintiff's mental health

11   symptoms and treatment with their autism symptoms and "treatment."  While the mental and

12   developmental impairments may have impacted each other, the ALJ ignored the role that

13   Plaintiff's autism itself and/or the combined impacts of Plaintiff's autism and their mental health

14   impairments played in Plaintiff's treatment noncompliance – whether it was mental health

15   treatment or otherwise.  To be sure, an ALJ may discount a claimant's symptom testimony based

16   on the claimant's unexplained or inadequately explained failure to follow a prescribed course of

17   treatment.  *See* SSR 16-3p, Titles II and XVI:  Evaluation of Symptoms in Disability Claims,

18   2017 WL 5180304, at *9-10 (Oct. 25, 2017); *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996,

19   1006 (9th Cir. 2015).  However, where, as here, there is evidence indicating the impairment itself

20   appears to be a cause of the claimant's noncompliance, the AJL is required to address that

21   possibility and explain why he is relying on the claimant's noncompliance despite the fact it

22   might be caused by Plaintiff's impairments themselves.  *See Garrison v. Colvin*, 759 F.3d 995,

23   1018 (9th Cir. 2014) ("[W]e do not punish the mentally ill for occasionally going off their

ORDER REVERSING THE COMMISSIONER'S DECISION - 10

medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions.").  Here, the ALJ's unsupported conclusion was insufficient and failed to account for Plaintiff's autism.  *See* Tr. 25 (noting that "[m]ental health conditions can interfere with the ability to seek and participate in treatment," and then summarily concluding "that does not appear to be the situation in this case").

Additionally, the "improvement" alluded to by the Commissioner was not a finding made by the ALJ.  Dkt. 11 at 8 (asserting that the school records cited by Plaintiff "are not reflective of Plaintiff's improvement while at school or improvement after graduation").  Under *Bray v. Commissioner*, the Court is limited to the reasons provided by the ALJ.  *See* 554 F.3d 1219, 1225-26 (9th Cir. 2009) (court reviews ALJ's decision "based on the reasoning and factual findings offered by the ALJ – not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking").  However, even if "improvement" had been a reason offered by the ALJ, the ALJ was nevertheless required by SSR 11-2p to then account for the role that Plaintiff's special accommodations and their structured, self-contained school setting played in any improvement.

Significantly, SSR 11-2p notes the differences between structured and supportive settings and "real world" work as follows:

> The young adult's ability to function in settings that are less demanding, more structured, or more supportive than those in which people typically work does not necessarily show how the young adult will be able to function in a work setting. . . . The more extra help or support of any kind that a young adult receives because of [their] impairment(s), the less independent [they are] in functioning, and the more severe we will find the limitation to be.

2011 WL 4055665 at *7. Accordingly,

> If a young adult can function only if [they] receive[] more help than would generally be provided to people without medical impairments, we consider how well the young adult would function without the extra help.  The more extra help or support

ORDER REVERSING THE COMMISSIONER'S DECISION - 11

of any kind that a young adult receives because of [their] impairment(s), the less independent [they are] in functioning, and the more severe we will find the limitation to be.

*Id.* at *8.

Here, the evidence shows significant accommodations and support, which the ALJ should consider on remand in evaluating the evidence.

Additionally, the "normal" examination findings cited by the ALJ and reiterated by the Commissioner concern visit notes regarding Plaintiff's 2021-2022 hormone replacement therapy for gender dysphoria and a 2022 visit for back pain and did not pertain to Plaintiff's autism; nor did they speak to the symptoms and/or limitations associated with Plaintiff's autism. *See* Tr. 26 (citing Tr. 366, 369, 372, 374, 377, 380, 407); Dkt. 11 at 6. The additional cited record – a November 2020 emergency room visit related to Plaintiff's suicidal thoughts and intent – also did not include "normal" findings, let alone findings that would have undermined the autism evidence. Tr. 407 (Plaintiff advises medical staff that they "want to be dead but don't have the guts for it.").

Furthermore, neither Plaintiff's stated desire to attend art school nor their seasonal employment at "Wild Waves" rendered the ALJ's error in failing to consider their education-related records harmless.

Plaintiff's testimony regarding their seasonal employment was, in fact, consistent with the social limitations described by their education-related records. Plaintiff testified that during the summers of 2019 and 2021, they worked as a ride operator, and then as a "gate guard" in 2021. Tr. 51. They explained that because they got overwhelmed and "could [not] function correctly," they were not allowed to work "in the front," but were instead assigned to sit at the back entrance to check employee nametags. Tr. 43. Contrary to the ALJ's finding otherwise,

1   Plaintiff testified at the 2023 hearing that they would not have been capable of working at the

2   amusement park regularly because the job left them "tired and sick all the time and [they]

3   couldn't perform tasks other than work."  Tr. 44; *cf.* Tr. 24 (finding that "claimant did not report

4   they were unable to do this work due to an inability to be around or interact with others").

5   Plaintiff further elaborated that the seasonal job drained them when they had to "talk to . . . and

6   interact with" people, and that it made them "not feel good" because people "tend to be mean to

7   [them]."  Tr. 45.

8          Plaintiff's October 2020 statements to a speech pathologist and a psychiatrist expressing

9   their desire to attend art school similarly fail to undermine the autism-related evidence.

10  Significantly, three years after the 2020 statements, in July 2023, Plaintiff testified that they had

11  not gone to art school, and, in fact, they had not received any training or schooling since they

12  graduated from high school in 2020.  Tr. 417, 422, 42; *cf.* Dkt. 11 at 7 (citing Tr. 24, 26).

13         Finally, the ALJ's observation that Plaintiff experienced "high functioning" autism also

14  did not render the error harmless.  Despite that designation, there is no dispute Plaintiff

15  continued for many years to require an IEP and placement in special education based on their

16  behavioral and social and emotional difficulties.

17         For the above reasons, the ALJ harmfully erred when he failed to properly consider the

18  impact of Plaintiff's autism pursuant to SSR 11-2p in evaluating the medical opinion evidence,

19  Plaintiff's testimony, the lay witness testimony, and in assessing their RFC.

20                                       **CONCLUSION**

21         For the foregoing reasons, the Commissioner's final decision is **REVERSED,** and this

22  case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. §

23  405(g)

1

2

3

4

5

On remand, the ALJ shall reevaluate the medical opinion evidence, Plaintiff's testimony, the lay witness testimony, evaluate the education-related evidence – including that which predates Plaintiff's application date, reassess Plaintiff's RFC, and reconsider the ALJ's step five findings as warranted.  In conducting the requisite sequential analysis on remand, the ALJ should follow the pertinent social security ruling, SSR 11-2p.  *See* 2011 WL 4055665.

6

DATED this 24th day of September, 2024.

7

8

9

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER REVERSING THE COMMISSIONER'S DECISION - 14